# United States Court of Appeals
## For the First Circuit

No. 08-1234

UNITED STATES OF AMERICA,

Appellee,

v.

DOUGLAS GORBEA DEL-VALLE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Lipez, Circuit Judges.

Lorenzo J. Palomares and Lorenzo Palomares, P.S.C. on brief for appellant.
Nelson Pérez-Sosa, Assistant United States Attorney, Germán A. Rieckehoff, Assistant United States Attorney, and Rosa Emilia Rodríguez-Vélez, United States Attorney, on brief for appellee.

May 12, 2009

**LYNCH**, **Chief Judge**. This appeal is about the denial of a new trial to a convicted significant drug conspirator. Even given that we are the only circuit which has ruled that an affidavit from a convicted codefendant who refused to testify at trial may be used to support a new trial motion because it was "unavailable" at trial, this defendant's appeal fails.

Douglas Gorbea Del-Valle, the appellant here, and José Ramón Hernández-Rodríguez were involved in a conspiracy to import, possess, and distribute a large amount of cocaine. Gorbea played a major role in the conspiracy: the trading company that he ran and partly owned was responsible for importing the cocaine shipment from Venezuela to Puerto Rico, and Gorbea was personally involved in many of the details of this operation. Hernández, by contrast, was a more peripheral figure: he owned a trucking company that Gorbea's company employed to transport the shipment from the docks to a nearby truck yard. Gorbea and Hernández were tried together and convicted in 1998 on four and five counts, respectively, arising from this conspiracy. This court affirmed both convictions in 2000. United States v. Hernández (Hernández I), 218 F.3d 58, 61 (1st Cir. 2000).

In 2002, Hernández filed a motion for a new trial under Fed. R. Crim. P. 33 based on an affidavit from Gorbea. The district court rejected the motion, but in 2006, this court reversed. United States v. Hernández-Rodríguez (Hernández II), 443

-2-

F.3d 138, 140 (1st Cir. 2006). We found that the government's case against Hernández had relied heavily on a theory that was directly undercut by Gorbea's affidavit and that, given the weak nature of the other evidence presented against Hernández, this new evidence could create a likelihood of acquittal upon retrial. See id. at 145-47.

In 2003, almost five years after his conviction, Gorbea filed his own motion for a new trial. Gorbea's Rule 33 motion was based primarily on an affidavit from his codefendant, Hernández. The district court summarily denied the new trial motion. Gorbea's case is entirely unlike that of his codefendant. A great deal of evidence links Gorbea to the conspiracy and demonstrates his substantial involvement with it. None of this evidence is undercut by the evidence presented in Gorbea's Rule 33 motion. We affirm the district court's ruling.

I.

The facts underlying this case are described more fully in our prior opinions. See Hernández II, 443 F.3d at 140-43; Hernández I, 218 F.3d at 61-63, 65-67. The essential facts are briefly recounted below.

On September 27, 1997, U.S. Customs officials received information that a container arriving from Venezuela at Crowley Yard in San Juan, Puerto Rico, contained contraband. Customs officials located the container the following day and moved it to

Customs facilities in Cataño for inspection. The bill of lading stated that the container held plastic cups and that the consignee was a supermarket. The consignee's representative was South Atlantic Trading Company (SATCO), which Gorbea ran and partly owned; Gorbea was listed as the person to be notified upon the container's arrival. Inside the container, customs officials discovered not only plastic cups but also 7,514 pounds (approximately 3,415 kilograms) of cocaine. The container was fitted with electronic tracking equipment, repackaged, and returned to Crowley Yard.

On September 29, Gorbea called the Customs office to inquire about the container. He identified himself as its owner and asked why it had been moved to Cataño. He was told there was no problem and that the container would be ready to be picked up soon. Later, Gorbea went personally to the customs broker to arrange for payment of the freight charges; an employee there reported that Gorbea seemed in a hurry to receive the shipment. Gorbea had also instructed his secretary to call the customs broker several times to "see what the status [of this shipment] was and to hasten them."

On October 2, after the necessary paperwork was completed, two employees from J.R. Transport, a company owned by codefendant Hernández, arrived to retrieve the container. Their truck pulled out of Crowley Yard and drove to a nearby truck yard,

followed by Hernández in a gray van -- and law enforcement officers. The truck took a halting and meandering route. It traveled along back roads and made several stops, sometimes remaining stopped for a half hour or more. It made U-turns and was often without its headlights (although other cars on the road had their headlights on). All told, a trip that would normally take about half an hour lasted about four.

At long last, the truck arrived at the truck yard. Officers observing the scene reported that another car arrived at the same time as the truck; the car contained several people, one of whom was carrying an object that may have been a gun. The people in the truck yard greeted and congratulated one another once the container was inside the lot. Their celebration was short-lived; officers moved in, made arrests, and seized the container.

Gorbea was arrested two months later. In his possession, officers discovered a fax dated February 5, 1997. The fax was addressed to Gorbea from a person in Venezuela about an earlier shipment of plastic cups. It said: "I urgently need the information of your friend that has the truck to square everything with him." On the back of the fax, among other handwritten notes, Gorbea had written the name José Hernández.

Gorbea and Hernández were tried together. Gorbea was charged with four counts related to the cocaine conspiracy;

-5-

Hernández faced five charges.[1]  At trial, neither presented any evidence and neither testified.

The prosecution also presented significant amounts of circumstantial evidence that linked Gorbea to the scheme, showing that he had knowledge of its workings.  At the time of the cocaine shipment, Gorbea's company, SATCO, had primarily been in the business of importing crackers.  When SATCO began importing plastic cups, these shipments were handled differently.  Gorbea was personally involved in these shipments to a greater extent than he was in the usual cracker shipments.  Around the time the shipments began, he insisted on taking private calls from a person identifying himself as "Wallace."  Once, a shipment of plastic cups arrived at SATCO in a state that suggested it had been opened and that something had been removed; when Gorbea's secretary reported this to him, Gorbea responded that he "already knew" and that it "didn't matter."  SATCO employed a different trucking company -- the company owned by Hernández -- to transport the plastic cup

---

[1]    Gorbea was charged with: conspiracy to possess with intent to distribute approximately 3,017 kilograms of cocaine, see 21 U.S.C. §§ 841(a)(1), 846; aiding and abetting in the attempt to possess with intent to distribute approximately 3,017 kilograms of cocaine, see 18 U.S.C. § 2; 21 U.S.C. § 846; conspiracy to import approximately 3,017 kilograms of cocaine into the United States, see 21 U.S.C. §§ 952(a), 963; and aiding and abetting in the importation of cocaine into the United States, see 18 U.S.C. § 2; 21 U.S.C. § 952(a).  Hernández was charged with the same violations, along with aiding and abetting in the possession with intent to distribute approximately 10 kilograms of cocaine, see 18 U.S.C. § 2; 21 U.S.C. § 841(a)(1).

-6-

shipments.[2]  SATCO imported the plastic cups even though it lost money on them; previous shipments had been sold at a loss. Finally, the supermarket listed as the consignee on the shipment at issue had never purchased plastic cups from SATCO and had no intention of purchasing any of the cups in this shipment.

By contrast, the government's case against Hernández was weaker.  The prosecution relied heavily on the theory that Hernández and Gorbea were close and trusted partners.  To prove that Hernández knowingly participated in the scheme, the government relied on the fax found in Gorbea's possession, which had the name "José Hernández" written on it, as well as on the circumstantial evidence surrounding Hernández's presence on the night the shipment was seized.  The defense theory was that the government had not shown that Hernández knew of the existence of cocaine inside the container his company had been hired to transport or that he knowingly participated in or helped facilitate the importation or distribution scheme.

A jury convicted both defendants of all the charges on September 3, 1998.  On appeal in 2000, this court affirmed both Gorbea's and Hernández's convictions.[3]  Hernández I, 218 F.3d at

_____

[2]    The trucker SATCO used for cracker shipments also hauled some shipments of plastic cups, but Hernández's company was used only for plastic cup shipments.

[3]    We also rejected Hernández's challenge to his sentence. Hernández I, 218 F.3d at 71.

71. We rejected, inter alia, Gorbea's challenge to the sufficiency of the evidence, finding that there was "sufficient evidence in the record to support the conclusion that Gorbea knew of and actively participated in the scheme to import and distribute cocaine." Id. at 66. Given the evidence presented, we added, "[i]t strains credulity to suggest that [Gorbea] would not have known the container's contents or the plans for distributing them." Id. We also found there was sufficient evidence to convict Hernández, id. at 66-67, noting that it was "[o]f great weight . . . that Gorbea wrote Hernández's name on the back of the fax," id. at 67, but acknowledging that the evidence on the record against Hernández was not overwhelming, see id. at 67 & n.6; see also Hernández II, 443 F.3d at 147.

A.        Hernández's Successful Motion for a New Trial

Two years later, on July 29, 2002, Hernández filed a motion for a new trial based on purportedly "newly discovered evidence." See Fed. R. Crim. P. 33(b)(1). Hernández's motion was based on an affidavit from Gorbea, in which Gorbea stated that he and Hernández did not know each other personally at the time of their arrest. See Hernández II, 443 F.3d at 141.

An evidentiary hearing was held on August 26, 2003 before a magistrate judge, at which Gorbea testified. Gorbea did not admit his own guilt, but stated that he never told truckers what they were hauling and that if he were to import drugs, he would

never inform the truckers because this would raise the cost of their services. See id. at 141-42. He also testified that the José Hernández to whom he had referred in the handwritten note on the back of the fax was not his codefendant but another person by the same name, who was employed by Crowley Maritime Shipping, and to whom he had spoken about a shipment of crackers. Crowley Maritime's records indicated that it had employed four people by that name at the relevant time; U.S. Customs Agent Brenda Talavera testified that she had gone to Crowley to determine whether a José Hernández had worked there, but that she did not remember the outcome of her investigation. See id. at 142-43. The hearing also revealed that the driver of the truck had given Agent Talavera an alternative explanation for his erratic driving on October 2: the truck's headlights were broken, so he used a circuitous route to avoid police detection. The driver's explanation was contained in the agent's report. See id. at 143.

Although the magistrate judge recommended that a new trial be granted, the district court ultimately rejected Hernández's motion on December 22, 2004. See id. at 140. Hernández appealed, and in 2006, this court reversed, over a dissent. Id.; see also id. at 149 (Howard, J., dissenting). We held that the district court abused its discretion in denying Hernández's new trial motion because the evidence in favor of Hernández presented in Gorbea's affidavit and his testimony at the

-9-

evidentiary hearing -- specifically, his alternative explanation of his handwritten note on the back of the fax -- directly undercut the government's conspiracy case against Hernández, which "relied heavily on the theory that Hernández and Gorbea were close and trusted partners."  Id. at 145-46 (majority opinion).  Because Gorbea's claim that no such relationship existed with Hernández, if credited by the jury, would likely lead to Hernández's acquittal, and because it was otherwise material and unknown or unavailable to Hernández at the time of the trial, despite due diligence, a retrial was warranted.  See id. at 143-48.

Hernández later waived his request for a new trial in exchange for a reduced sentence, thus accepting the conviction and essentially admitting guilt.  An amended judgment as to Hernández was entered on February 14, 2007.

B.        Gorbea's Motion for a New Trial

Meanwhile, on May 30, 2003, Gorbea filed his own Rule 33 motion for a new trial based on purportedly newly discovered evidence.  Gorbea's motion was based, not surprisingly, on an affidavit from Hernández.  In his affidavit, Hernández stated that he did not know Gorbea personally, that the extent of their relationship was merely a business agreement to transport the container from the port to its destination, and that Gorbea did not instruct him as to what to do with the cargo other than to deliver it to its destination.  Hernández further stated that he had

-10-

received information that the Venezuelan National Guard had inspected the container at issue on September 24, 1997, prior to its shipment, and that this search had revealed no drugs. According to Hernández, a Venezuelan attorney named Gustavo Morales had original documentation of this inspection and could provide this evidence. Gorbea did not produce an affidavit from Morales or any other evidence of this alleged inspection.

On June 5, 2003, Gorbea amended his new trial motion to add the Crowley Maritime records, which showed there were multiple people named José Hernández working for the company, and argued that this supported his claim for a new trial. The records had been subpoenaed as part of Hernández's new trial motion, and Hernández's counsel had moved to admit these documents into the record on the same day that Gorbea filed his original new trial motion.

More than four years later, the government, astonishingly, had not responded to Gorbea's motion and the busy court had not ruled on it.

On August 28, 2007, after the matter of codefendant Hernández had been resolved, Gorbea filed a renewed new trial motion. The motion reiterated the claims made in the original motion and added a new claim based on certain evidence revealed in Hernández's later evidentiary hearing. Gorbea argued that the government violated <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963), when it

-11-

earlier failed to disclose to him the evidence that Agent Talavera went to Crowley to investigate whether another José Hernández worked there as well as the truck driver's explanation of his erratic driving contained in the agent's report.

Again, the government did not respond to Gorbea's motion. On January 16, 2008, the district court denied Gorbea's motion without comment. Gorbea timely appealed.

## II.

As an initial matter, we note that Gorbea's new trial motion was clearly untimely. Under Fed. R. Crim. P. 33(b)(1), "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Gorbea was convicted in 1998, but did not file his new trial motion until 2003, almost five years later.[4] It is unclear

---

[4] The current three-year time limit was put in place by a 1998 amendment to Rule 33; before the amendment, Rule 33 allowed a defendant to file a new trial motion within two years of the final action of the court of appeals. United States v. Mojica-Rivera, 435 F.3d 28, 32 (1st Cir. 2006); Fed. R. Crim. P. 33 advisory committee's note, 1998 amendments. The amendment became effective on December 1, 1998, Mojica-Rivera, 435 F.3d at 32, a few months after Gorbea was convicted. However, the new version of Rule 33 would apply to Gorbea so long as such application would be just and practicable. Id. at 32-33; see also Hernández II, 443 F.3d at 150 n.10 (Howard, J., dissenting). Here, there is no reason why applying the amended Rule would be unjust or impracticable, since Gorbea had over two-and-a-half years to file his Rule 33 motion after the 1998 amendment became effective. See Mojica-Rivera, 435 F.3d at 33 (holding that the new time limit should apply to a defendant who had eighteen months to file); see also Hernández II, 443 F.3d at 150 n.10 (Howard, J., dissenting). Moreover, even under the previous version, Gorbea's 2003 motion was untimely since it was not filed within two years of this court's final action in

whether the district court based its ruling on lack of timeliness. Moreover, the government, which utterly failed to respond to Gorbea's motions before the district court, may well have forfeited any argument on the timeliness issue. See Eberhart v. United States, 546 U.S. 12, 19 (2005) (per curiam) (holding that the time bar in Rule 33 is non-jurisdictional and may be forfeited); Hernández II, 443 F.3d at 150 (Howard, J., dissenting) (noting that the government likely forfeited the timeliness argument with regard to Gorbea's codefendant). We need not resolve this issue, since Gorbea's claims may be easily disposed of on the merits.

We review a district court's denial of a new trial motion for manifest abuse of discretion. Hernández II, 443 F.3d at 143; United States v. González-González, 258 F.3d 16, 20 (1st Cir. 2001). "The remedy of a new trial must be used sparingly, and only where a miscarriage of justice would otherwise result." United States v. Conley, 249 F.3d 38, 45 (1st Cir. 2001).

Defendant's new trial motion was based on both newly discovered evidence -- Hernández's affidavit and the Crowley Maritime records -- and the evidence that he claims should have been disclosed under Brady. Slightly different standards apply to these two claims, but both require the defendant to show some degree of prejudice. Id. at 45; see also González-González, 258 F.3d at 20. Here, both claims fail.

---

Hernández I, which was decided in 2000.

-13-

A.          <u>Newly Discovered Evidence</u>

A defendant who seeks a new trial on the basis of newly discovered evidence bears a "weighty burden" of establishing that: (1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material and not merely cumulative or impeaching; and (4) the emergence of the evidence will probably result in an acquittal upon retrial of the defendant.  <u>Hernández II</u>, 443 F.3d at 143; <u>González-González</u>, 258 F.3d at 20; <u>Conley</u>, 249 F.3d at 45.  A new trial motion must be denied if the defendant fails to meet any one of these factors. <u>González-González</u>, 258 F.3d at 20.  A showing of prejudice under the fourth prong of the test requires an "actual probability that an acquittal would have resulted if the evidence had been available." <u>Id.</u> (quoting <u>United States</u> v. <u>Sepulveda</u>, 15 F.3d 1216, 1220 (1st Cir. 1993)) (internal quotation marks omitted).

Defendant's claim is based on his codefendant's affidavit and on the Crowley Maritime records showing more than one José Hernández worked there.  As to the Crowley Maritime records, none of the four prongs were met.  If defendant thought they were material, he could easily have obtained them previously because he was the one with the knowledge that there was more than one José Hernández.  The evidence was not unavailable at the time. Moreover, there is no actual probability that the records from

-14-

Crowley Maritime would have led to acquittal if they had been presented at trial. The fact that multiple people working at Crowley had the name José Hernández says little about whether Gorbea conspired with his codefendant Hernández or with numerous other people to import cocaine.

We turn to the Hernández affidavit. In <u>United States</u> v. <u>Montilla-Rivera</u>, 115 F.3d 1060 (1st Cir. 1997), this court held that a later affidavit from a codefendant who asserted his Fifth Amendment privilege at trial is not "per se insufficient under Rule 33," <u>id.</u> at 1067, because such statements may constitute evidence that was "unavailable" under the first prong of the test, <u>id.</u> at 1065-66.[5] In that case, we ruled that the district court should have considered two belated codefendant affidavits. <u>See id.</u> at 1067. We noted, however, that "[o]ur judgment . . . turn[ed] on unusual circumstances including the weakness of the government's case against the defendant, significant efforts to procure the codefendants' testimony before his own conviction, and the

_____

[5] Ten other circuits disagree, treating such evidence as categorically insufficient to ground a Rule 33 motion, at least where the defendant knew or should have known his codefendant could offer material testimony. <u>See United States</u> v. <u>Owen</u>, 500 F.3d 83, 88-91 (2d Cir. 2007); <u>Hernández II</u>, 443 F.3d at 149 n.8 (Howard, J., dissenting) (citing <u>United States</u> v. <u>Jasin</u>, 280 F.3d 355, 364-68 (3d Cir. 2002)); <u>see also</u> 3 Wright, King & Klein, <u>Federal Practice and Procedure</u> § 557, at 546-47 (3d ed. 2004 & Supp. 2009) (stating in general that "[p]reviously known, but only newly available testimony of a codefendant or coconspirator who invoked his Fifth Amendment privilege against self-incrimination and did not testify at trial does not qualify as 'newly discovered evidence'" under Rule 33 and collecting cases).

plausible explanation as to why the evidence was not available earlier." Id. at 1067-68. We explicitly cautioned, moreover, that such evidence must be regarded with "great skepticism," since "[i]t is not unusual for the obviously guilty codefendant to try to assume the entire guilt" and "[a] convicted, sentenced codefendant has little to lose (and perhaps something to gain) from such testimony." Id. at 1066; see also id. at 1067 ("[W]e share the general skepticism concerning [such] statements, and the present opinion by no means confers any automatic right in such a case to a new trial or even to a hearing."). Similarly, in Hernández II, we considered the affidavit that Gorbea submitted in favor of Hernández's new trial motion, while reiterating these warnings. Hernández II, 443 F.3d at 144; see also id. at 149 (Howard, J., dissenting).

This case does not present the same sort of "unusual circumstances" that animated our decision in Montilla-Rivera, 115 F.3d at 1067. The government's case against Gorbea was not weak and there is no evidence that Gorbea undertook any efforts to secure Hernández's testimony at trial. Likewise, the government's case against Gorbea was much stronger than its case against Hernández. Nonetheless, out of an abundance of caution, we consider Hernández's affidavit under the other prongs of the test, "proceed[ing] through the remainder of the inquiry with the appropriate caution," Hernández II, 443 F.3d at 144.

There is no actual probability that Hernández's affidavit in this case would have led to acquittal given the substantial amount of other evidence supporting Gorbea's conviction. See González-González, 258 F.3d at 23. Hernández's affidavit would have had little effect on the government's case against Gorbea, quite unlike Gorbea's testimony in support of his codefendant's motion, which we found went directly to the heart of the government's case against Hernández, see Hernández II, 443 F.3d at at 145. The government's case against Gorbea was supported by "[a] great deal of circumstantial evidence [that] linked Gorbea to the scheme and indicated his knowledge of the scheme's contours," Hernández I, 218 F.3d at 65, none of which is undercut by the claim in Hernández's affidavit that he did not know Gorbea personally.

In his affidavit, Hernández claims as well that he heard the container at issue in this case had been inspected by the Venezuelan National Guard and found not to contain drugs. He does not identify the source of this information, which is hearsay, or why he would have had access to it. Also, his claim is uncorroborated by any other evidence. The documentary evidence allegedly in the possession of the Venezuelan attorney was not submitted, nor was there any evidence suggesting that Gorbea ever undertook efforts to procure it. And even if this claim were true, the fact that Hernández was aware of the inspection would say

little about Gorbea's knowledge and would not establish that drugs were not placed in the container after the inspection.

In addition, other independent evidence went to Gorbea's guilt -- for example, the fax found in Gorbea's possession with the name "José Hernández" written on it,[6] Gorbea's unusual personal involvement with the shipment, the fact that his company did not regularly import plastic cups but did so here at a loss, and the fact that the supermarket listed as the consignee on the shipment had no intention of buying any plastic cups from the company.

B.        The Alleged Brady Violation

We apply a slightly different standard when a defendant seeks a new trial on the basis of newly discovered evidence that he claims should have been produced under Brady.  Conley, 249 F.3d at 45; see also González-González, 258 F.3d at 20.  For such claims, the defendant must establish that: (1) the evidence at issue is material and favorable to the accused; (2) the evidence was suppressed by the prosecution; and (3) the defendant was prejudiced by the suppression in that there is a reasonable probability that,

_____

[6]        In his testimony supporting Hernández's new trial motion, Gorbea offered an alternative explanation for the name written on the fax and suggested it referred to a different José Hernández. Even if this explanation were true, it cannot inform Gorbea's own new trial motion.  If defendant was aware of this information but refused to testify about it at trial, he cannot now claim it is "newly discovered" under Rule 33.  See 3 Wright, King & Klein, supra, § 557, at 546-47 ("Evidence known to defendant . . . at the time of trial will not suffice [under Rule 33]. . . . Defendant is not permitted to change his strategy after an unfavorable verdict and use evidence he chose not to present at the trial.").

had the evidence been disclosed to the defense, the result of the proceeding would have been different. Conley, 249 F.3d at 45; accord United States v. Rivera Rangel, 396 F.3d 476, 485 (1st Cir. 2005). The "reasonable probability" standard for showing prejudice under this test is easier to satisfy than the "actual probability of acquittal" standard for prejudice used in claims of newly discovered evidence unrelated to alleged Brady violations. González-González, 258 F.3d at 20; Conley, 249 F.3d at 45.

Gorbea claims the government violated Brady by failing to disclose evidence that an agent went to Crowley to investigate whether another José Hernández worked there as well as the report containing the truck driver's alternative explanation for his erratic driving. Even assuming dubitante the two pieces of evidence satisfied the first two prongs of the test for new trial motions based on alleged Brady violations, Gorbea cannot show a "reasonable probability" that this evidence would have changed the outcome of the trial. That Agent Talavera attempted to investigate whether another José Hernández worked at Crowley does not establish that Gorbea was not involved in the conspiracy or that he did not conspire with his codefendant Hernández (or with others). The record shows that the jury had already been presented with the driver's alternative explanation through the testimony of another government witness. Hernández II, 443 F.3d at 147. Even had the evidence that is the basis of Gorbea's claim been presented, there

were ample grounds on which the jury could have convicted Gorbea. See <u>Rivera Rangel</u>, 396 F.3d at 486.

## III.

The district court did not commit a manifest abuse of discretion in denying defendant's new trial motion.  The judgment of the district court is <u>affirmed</u>.